**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | | |
|---|---|---|
| **MIGUEL V. MARTINEZ** | § | **CIVIL ACTION NO. 2:22-cv-02123** |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **MORAN TOWING OF LAKE** | § | |
| **CHARLES, LLC** | § | |
| *Defendant* | § | |
| | § | **JURY DEMAND HEREIN** |

---

### PLAINTIFF'S ORIGINAL COMPLAINT

---

**NOW INTO COURT,** through undersigned counsel, comes Plaintiff, **MIGUEL V. MARTINEZ**, resident of the full age of majority and domiciled in Montgomery, Texas, who respectfully avers as follows:

---

### JURISDICTION AND VENUE

---

1. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, as it appears at 42 U.S.C. § 2000 *et seq.*, and the Age Discrimination in Employment Act of 1967, as it appears at 29 U.S.C. § 621 *et seq*.

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3.  Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) prior to instituting action. Plaintiff filed said EEOC Charge on or about June 19, 2018 (Charge No. 461-2018-02245).

4.  Plaintiff received the EEOC's Notice of Conciliation Failure and Notice of Right to Sue on June 10, 2022. *See* Exhibit A. Plaintiff is afforded 90 days from his receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5.  Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Calcasieu Parish, making the Lake Charles Division the most appropriate Division for this suit. Defendant terminated Plaintiff from employment at its Lake Charles site, located within the Parish of Calcasieu, State of Louisiana.

## PARTIES

6.  Plaintiff is a citizen of the United States and resides in the State of Texas.

7.  Defendant, **MORAN TOWING OF LAKE CHARLES, LLC** ("MORAN"), is a domestic limited liability company authorized and conducting business in the State of Louisiana. It may be served through its agent for service of process at Corporation Service Company, 501 Louisiana Avenue, Baton Rouge, Louisiana 70802.

8.  At all times relevant to the instant suit, Plaintiff worked for Defendant at its Lake Charles, Louisiana location, which is located within the Parish of Calcasieu, State of Louisiana.

*{Remainder of Page Intentionally Left Blank}*

## STATEMENT OF FACTS

9.  Plaintiff began his employment with Defendant on or about August 8, 2007.

10. Consistently throughout his employment, and as corroborated by his former performance reviews, Plaintiff performed his duties exemplarily, both in his capacity as a boat captain and, later, as a Senior Captain/Operations Manager.

11. At all times, Plaintiff was known throughout the facility as a man who would work extensively to resolve workplace matters with professionalism and respect.

12. Jessica Castro ("Castro"), a female deckhand, was employed by Defendant from November 24, 2014 through her termination on April 6, 2016.

13. In May 2016, Castro filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (Charge No. 460-2016-02928), alleging sex/gender discrimination in employment and claiming that she was denied equal training and was subjected to less favorable working conditions than her former, male co-workers. Castro also alleged retaliation, claiming that she had been terminated by Defendant after reporting her concerns of gender/sex discrimination to Moran.

14. In Castro's EEOC Intake Questionnaire, Castro listed Plaintiff as a favorable witness and indicated that Plaintiff would attest that she was subjected to unlawful discrimination and retaliation.

15. In Castro's description of events, Castro repeatedly named Plaintiff as an individual in which she confided or to whom she otherwise reported her concerns during her employment.

16. Defendant retained attorney, Ms. Susan Desmond, to investigate Castro's discrimination and retaliation claims. In a formal report to Defendant's in-house Counsel, Mr. Kurt Odell, Ms. Desmond wrote, "it was due to my conversation with [Plaintiff] that I recommended discussing early resolution of Castro's claim as his support left me in the position of having to 'impeach' a member of management regarding performance issues – which can be quite subjective."

17. Additionally, during Ms. Desmond's investigation, several male employees wrote statements, wherein they accused Plaintiff of showing favoritism toward Castro, who had been the only female deckhand at the entire facility. In response to these employee statements, Plaintiff submitted a formal rebuttal statement, wherein he defended his actions and articulated his belief that Castro had been subjected to disparate treatment of the basis of her gender/sex.

18. Upon Castro's receipt of her Notice of Suit Rights from the EEOC in approximately February 2018, she filed a lawsuit in the Western District of Louisiana, Lake Charles Division, bearing the following caption: *Jessica Castro v. Moran Towing of Lake Charles,* Civil Action No. 2:18-cv-00286) (the "*Castro* Litigation") Paragraph 32 of Castro's Complaint provides that she "complained . . . to Operations Manager Miguel Martinez and told Martinez what was happening and Jessica Castro's Mistreatment. Then she began to be retaliated against" [D.E. 2, p. 6].

19. The *Castro* litigation was voluntarily dismissed on May 1, 2018 due to the parties reaching an out-of-court settlement [D.E. 4, 6].

20. On May 10, 2018, which was less than ten (10) days after the *Castro* Litigation was formally removed from the Court's docket–Jeffery Beech ("Beech"), Plaintiff's immediate

supervisor, approached Plaintiff in his office and informed Plaintiff that Defendant wanted to move Plaintiff from Operations Manager to a Port Captain position at Defendant's Cameron, Louisiana facility.

21. When Plaintiff asked Beech why Defendant wanted to transfer him, Beech informed Plaintiff that Defendant was looking to employ someone "younger with a college education" for the Operations Manager position with the hope that the individual could be "groomed for [Martinez's]] and [Beech's] positions." In response, Plaintiff asked for the proposed timeframe of the transfer, to which Beech responded, "not sure, but soon."

22. Thereafter, and consistently throughout May 2018, Plaintiff approached Beech on several occasions regarding the purported transfer which was, in all objective aspects, a demotion. During one conversation, which took place between May 10, 2018 and May 25, 2018, Plaintiff learned that the Port Captain position originally "offered" to him had been revoked, and he was, instead, asked to move to a Boat Captain position.

23. The Boat Captain position paid a substantially lower salary than the Operations Manager position.

24. During the conversation, Beech reiterated that Moran was looking for a "younger and college educated" individual to fill the Operations Manager role; however, Beech further stated that the "Company," including Vice President of Out Port Operations, Mark Vanty ("Vanty"), had reviewed the "negative statements" from the internal *Castro* investigation and that the statements "didn't sit well with them."

25. During the conversation, Beech informed Plaintiff that Defendant had already made the decision to demote him to Boat Captain, and there was nothing Plaintiff could do to change the outcome.

26. During the conversation, Beech informed Plaintiff that he (Beech) had asked Vanty about relieving the Captain aboard the Tristin K for his poor performance during an Internal Audit, to which Vanty replied, "no."

27. On May 31, 2018, Plaintiff asked Beech for permission to speak with Vanty regarding the demotion. In response, Beech stated he and Vanty would be in Houston for a meeting and that, at that time, Beech would speak with Vanty about meeting Plaintiff to discuss the position change.

28. Beech told Plaintiff that he had been instructed, by persons he would not name, to release Plaintiff from the Operations Manager position. Beech further told Plaintiff that he would understand if Plaintiff decided to resign from Defendant given the circumstances.

29. Plaintiff indicated to Beech that he was not looking to resign.

30. Plaintiff asked Beech whether Defendant would transfer his Operations Manager salary to the Boat Captain position giving his years of company service, to which Beech replied, "no."

31. Plaintiff again asked Beech the reason for the demotion. In stark contrast to Beech's previous reason, Beech indicated a new reason: Defendant had investigated three (3) purported events involving Plaintiff: 1) a crewmember falling into water; 2) a fuel spill; and 3) results of a recent audit.

32. Plaintiff was not at fault for any of the events listed by Beech.

33. On June 8, 2018, Beech informed Plaintiff that: 1) Vanty did not wish to speak to Plaintiff about his concerns; and 2) Beech and Vanty needed Plaintiff's final decision about going back aboard the Tugs as a Boat Captain.

34. During the conversation, Beech stated to Plaintiff, "it's just going to get worse for you if you don't move to the boat."

35. In response to Beech's statement, Plaintiff asked why he was being demoted, and Beech reiterated the three (3) reasons set forth in Paragraph 31. Immediately thereafter, Beech asked Plaintiff whether he had been made aware that the *Castro* Litigation had settled. When Plaintiff replied, "no," Beech indicated his belief that Plaintiff was demoted as a direct result of Vanty reviewing Plaintiff's statements and involvement in the *Castro* investigation and litigation, accompanied with Vanty's displeasure at the figure awarded to Castro via settlement.

36. Beech informed Plaintiff that he (Plaintiff) was being blamed, in large part, for the *Castro* Litigation and resultant damages that Defendant had to pay.

37. On June 14, 2018, during a phone conversation with Beech, Plaintiff reiterated that he did not want to accept the demotion to a Boat Captain position. In response, Beech instructed Plaintiff to "make it look like it was his decision" and to "put that story together" so as to appear as though Plaintiff was either: 1) requesting the demotion voluntarily; or 2) was graciously accepting the demotion.

38. Plaintiff refused to indicate to any agent or employee of Defendant that he requested or otherwise accepted the demotion.

39. During Plaintiff's conversation with Beech on June 14, 2018, Plaintiff indicated his concern that he was facing undue, unjustified retaliation and that he viewed the demotion as the means through which Defendant would ultimately try and terminate him. In response, Beech stated, "I can't argue with you" and ended the conversation by stating, "I'm doing what I'm being told" and that he had no hard feelings for Plaintiff.

40. Fearing that he would face immediate termination if he did not agree to the Boat Captain position, Plaintiff reluctantly accepted the demotion to the Boat Captain position. This demotion resulted in an approximate annual salary reduction of $12,000.00.

41. On June 18, 2018, Plaintiff directed email correspondence to Defendant's Vice President, General Counsel and Secretary, Mr. Alan Marchisotto ("Marchisotto") and to Defendant's Director of Human Resources, Kathy Soloman ("Soloman"). Entitled, "RETALIATION AGAINST ME FOR PARTICIPATING IN AN EMPLOYMENT DISCRIMINATION INVESTIGATION OF JESSICA CASTRO," Plaintiff explained his sincere belief that his sudden, unexpected, and unjustified demotion from Operations Manager to Boat Captain was retaliation for the statements and information he provided during the investigation into Castro's claims.

42. On June 19, 2018, Plaintiff filed a *pro se*, formal Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, therein alleging unlawful retaliation.

43. On June 27, 2018, Plaintiff met with Kurt Odell, Defendant's in-house counsel, to discuss the email correspondence he had submitted to Marchisotto and Soloman.

44. On July 12, 2018, Plaintiff received a call from Odell, indicating that Defendant's investigation into his claims had concluded. Both Beech and Steve Kelly were present on the call.

45. On July 25, 2018, Plaintiff was placed as a Boat Captain on the Tristan K. At the time, Plaintiff had two (2) new employees assigned to him: 1) Brandon Hebert ("Hebert") and 2) Geoffrey Denesse ("Denesse").

46. Plaintiff conducted a meeting with Hebert and Denesse, during which he informed them that, if they had any concerns, problems, or questions, they should not hesitate to contact him.

47. On August 22, 2018, Beech provided Plaintiff with his shoreside performance evaluation, which stated that Plaintiff had not met his job expectations. Under "performance shortfalls," the document listed certain "safety incidents," including an employee falling in the water at the dock, a fuel spill, and the outcome of the Tristan K's internal audit.

48. Plaintiff was not aboard the motor vessel ("M/V") Catherine C. Moran when the man overboard incident occurred, nor was he aboard the M/V Hercules when the fuel spill incidents occurred. Upon information and belief, he was not scheduled to work on the day the man overboard occurred, and Plaintiff had not yet arrived at the worksite when the fuel spill occurred.

49. The evaluation stated that Plaintiff's attendance on the boats for drills and inspections were insufficient to ensure that the drills and inspections were carried out. When Plaintiff asked Beech whether he (Beech) or another employee had completed the evaluation, Beech indicated, "someone else."

50. Plaintiff refused to sign the evaluation.

51. Plaintiff asked whether he could appeal the evaluation, to which Beech replied, "you'll have to address that with Kurt Odell."

52. Plaintiff made repeated requests for documentation and information justifying the demotion and the procedure by which Defendant carried out the same; however, Defendant refused to provide Plaintiff with the requested information.

53. On December 12, 2018, Plaintiff noticed that Hebert was departing from the boat while carrying plastic bags. Later that morning, Plaintiff approached Hebert and asked him why he departed the boat. In response, Hebert informed Plaintiff that he was "going on another boat" and told Plaintiff that "Jeff (Beech)" would tell Plaintiff the reason therefore.

54. When Plaintiff contacted Beech about Hebert's unexpected transfer, Beech explained that he had placed Hebert on another boat because "things just weren't working out."

55. On December 13, 2018, Plaintiff traveled to Port Arthur for four (4) days of refresher training.

56. The following day, when the boat arrived to the company dock, Plaintiff noticed Beech's vehicle out in the parking lot. At that time, Plaintiff sent Beech a text message stating, "Mornin Sir, I see you're here in PA. I'm on the Haley, we just pulled in at the dock. If we're still here before you leave, I'd like to speak with you please."

57. At approximately 9:50 a.m., Beech called Plaintiff to let him know that he was on the barge so that they could speak.

58. Plaintiff asked Beech why he transferred Hebert, and Beech indicated that Hebert had come to him accusing Plaintiff of not showing him things he had asked to be shown. Plaintiff was completely surprised by the allegation, maintaining that the same was entirely untrue and that Plaintiff had shown Hebert "everything there is to know," down to even chart corrections. In response, Beech stated, "he didn't know how to do chart corrections?" to which Plaintiff replied "no."

59. During the conversation, Plaintiff expressed his concern that this purported issue was a set up, and that Hebert forged a deliberate fabrication of the truth. Beech noted his agreement.

60. Plaintiff reiterated to Beech that Hebert had not, at any time, discussed the purported issue with him and that Hebert had jumped the chain of command.

61. At no time whatsoever did Beech instruct Plaintiff to stay away or otherwise avoid contact with Hebert.

62. On December 16, 2018, Plaintiff returned to the port location in Lake Charles, Louisiana. Upon his return, Plaintiff sent Hebert a text message, therein asking to meet with him. In response, Hebert stated, "I have nothing to say."

63. Plaintiff walked out to the boat to speak with Hebert, and he located him sitting at the end of a galley table.

64. As Plaintiff stood against a neighboring wall with his hands in his jacket pockets, Plaintiff began conversing with Hebert, at which time Hebert instructed him, "if you want to know what's going on, ask Jeff (Beech)."

65. When Plaintiff informed Hebert that he had already spoken to Beech and remained unsure as to what gave rise to Hebert's purported complaint, Hebert replied, "you'll figure it out." In response, Plaintiff told Hebert, "I am here to figure it out" and, again, asked Hebert to explain or otherwise articulate the training or direction Plaintiff had purportedly refused to provide.

66. In a combative response, Hebert stated, "you don't know me, you don't know who I am." Taken aback by Hebert's comment, Plaintiff responded, "well, obviously, I don't. And you don't know who I am, either. I just want to know why you said what you said to Jeff."

67. Thereafter, Captain Robert "Bob" Boughamer walked up and instructed Plaintiff and Hebert to end the conversation. Plaintiff subsequently departed from the boat and avoided any further contact with Hebert.

68. At no time did Plaintiff make any physical contact with Hebert, nor did Plaintiff ever make any motion indicative that he would attempt to make any physical contact with Hebert.

69. On December 17, 2018, Beech contacted Plaintiff, instructing him not to return to work until further notified. When Plaintiff asked for the reason, Beech informed Plaintiff that Hebert had written a statement accusing Plaintiff of intimidating him, tell him that he "wasn't a man," and calling him a "coward" and a "liar."

70. On December 19, 2018, Beech texted Plaintiff, asking him to contact Odell. Plaintiff did as instructed and contacted Odell that afternoon.

71. During the conversation, Odell asked Plaintiff for his rendition of the "incident" involving Hebert. Then, Odell stated that there was no perceived threat, but, rather, Hebert had simply felt intimidated.

72. During the call, Plaintiff asked Odell whether Hebert had indicated any concerns with a purported lack of training from Plaintiff, and Odell responded that the scope of his investigation was narrow and that he did not know.

73. Odell asked Plaintiff whether he had ever been instructed by Beech to refrain from communicating with Hebert. Plaintiff verified to Odell that he had not received any such instruction.

74. On December 20, 2018, Plaintiff received a joint phone call from Beech and Steve Kelly. During the conversation, Beech informed Plaintiff that he was being terminated, made effective immediately.

75. Plaintiff inquired as to the reason for his termination, at which time Beech informed Plaintiff that he would receive a letter detailing the justification.

76. During the conversation, Plaintiff began raising issues about other employees, including another Boat Captain who had violated company policies with no reprimand whatsoever; however, Beech deflected.

77. During the conversation, Plaintiff stated his belief that it had become a "witch hunt" since Plaintiff sent the email to Human Resources, and he asked Beech to reconsider the termination decision.

78. In response to Plaintiff's reconsideration request, Beech stated, "that's not going to happen," and the call ended shortly thereafter.

79. On December 21, 2018, Beech directed a formal letter to Plaintiff, memorializing the December 20, 2018 telephone call. The document, however, included two additional comments. First, Beech indicated, for the first time, that Plaintiff's conduct "rises to the level of insubordination, which is grounds for immediate dismissal under Section 3.5 of Moran's Disciplinary Policy and Procedures of the OPPM." Next, the letter states, "you have been counseled and received progressive discipline several times over the past two (2) years on similar matters involving your improper use of administrative authority, and were warned that any further violations of company policies would result in negative employment action up to and including termination."

80. Beech's statement is false. Plaintiff, as Operations Manager, was in charge of maintaining employee personnel files and knew, for a fact, that he had not received any counseling or discipline regarding purported "improper use of administrative authority."


*{Remainder of Page Intentionally Left Blank}*

## FIRST CAUSE OF ACTION
## VIOLATION(S) OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT
## (ADEA)
### *Pursuant to 29 U.S.C. 621 et seq.*

81. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

82. At all relevant times, Plaintiff was over the age of forty (40) and, as such, is a member of the protected age class. As of May 2018, Plaintiff was fifty-eight (58) years old.

83. Plaintiff was qualified for his position as Operations Manager, as he was specifically selected for the position and performed the duties of the same exemplarily for several years.

84. Plaintiff was also qualified for his position as Boat Captain, as he was originally hired by Defendant in that capacity and successfully performed the associated job duties exemplarily throughout his tenure with Defendant.

85. Defendant demoted Plaintiff from Operations Manager to Boat Captain. As such, Plaintiff suffered from an adverse employment action.

86. When Plaintiff asked why he was being removed from his Operations Manager role, Beech stated that the company wanted to fill the role with "someone younger and with a college education."

87. Plaintiff was demoted from the Operations Manager position due to his age.

88. The proffered reasons for demoting Plaintiff are illegitimate and pretextual.

89. The "man overboard" incident occurred in January 2018 and, thus, five (5) months before the incident was ever even brought of Plaintiff's attention. Moreover, Plaintiff was not present on the boat when the incident occurred.

90. Defendant's own investigation reveals that Plaintiff was not involved in the "man overboard" incident. Plaintiff's name did not appear on the list of "involved personnel" interviewed regarding the incident.

91. Defendant attempted to cast blame for "failing to stop operations" that occurred on a day he was not at work.

92. Plaintiff was not present on the day of the fuel spill.

93. Pursuant to Defendant's Operating Policies and Procedures Manual ("OPPM"), the Operations Manager is not responsible for fuel transfers. Rather, the Port Engineer aboard the vessel, in addition to the captain, are the individuals held responsible for incidents that occur during fuel transfers.

94. Under Defendant's OPPM, the individuals responsible for the fuel spill were Port Engineer, Jimmy Wriston, Jr. and Captain, Doug Caradec.

95. Both Jimmy Wriston, Jr. and the Mate, Blake Newman, were aboard during the fuel transfer; however, several weeks prior to the incident, Captain Caradec had instructed his deckhand to remove a fuel valve from the starboard side of the vessel. Once the deckhand completed the task, Captain Caradec neglected to verify that the work had been completed properly and in accordance with regulations and policy.

96. The deckhand failed to properly secure the valve, which is what led to the fuel spill.

97. As Operations Manager, it was Plaintiff's responsibility to ensure that all captains were made aware of upcoming audits. Plaintiff's duties encompassed ordering items that may hinder the vessel passing the audit, including purchasing safety equipment and replacing missing or outdated materials.

98. The Captain assigned to the vessel is responsible for crewmember action and to ensure that the crew is well-versed in the OPPM and safety matters.

99. It is the Captain's responsibility to conduct all monthly drill in accordance with the OPPM and ensure that crewmembers participate in required safety drills.

100.    Upon completion of the requisite drills, captains would communicate with Plaintiff, generally via email, informing Plaintiff that drills had been completed.

101.    It was not until after Captain Heriberto Heredia failed the Internal Audit a second time that Beech instructed Plaintiff to attend all the vessels to observe the captain's complete monthly drills. After instructing Plaintiff to do so, Beech passed the information on to all captains during the morning meetings and/or crew changes.

102.    From that point forward, each captain contacted Beech, and either Plaintiff or Jimmy Wriston, Jr. would go to the various vessels to observe drills as they took place.

103.    Shortly after Plaintiff was demoted to Boat Captain and placed aboard the Tristan K, Beech informed Plaintiff that Plaintiff would no longer require the Operations Manager to observe captains performing drills aboard their respective vessels.

104.    After Captain Heredia failed the Audit, Plaintiff, while acting as Operations Manager, asked Beech what action Defendant should take, considering that a captain's failure to conduct drills was a deliberate violation of the OPPM. When Plaintiff asked whether Heredia should be terminated, Beech instructed Plaintiff to issue him a write-up instead.

105.    Plaintiff is aware of another, previous incident involving Captain Heredia, wherein an employee reported Captain Heredia to both Plaintiff and Beech, alleging that Captain Heredia was fabricating his monthly safety drills (i.e., not performing the drills with the

crew and falsely reflecting completion of the same in paperwork he submitted). In response, Plaintiff and Beech called Captain Heredia into the office and, when they asked him whether the allegations were true, Captain Heredia replied, "yes." While the fabrication of safety drill worksheets constitutes a serious violation of the OPPM, Captain Heredia received nothing more than a written reprimand.

106.    Defendant failed to act in accordance with Section 2000 *et. seq.* of Title VII of the Civil Rights Act of 1964.

107.    Wherefore Plaintiff asks this Honorable Court to find Defendant liable for the violation of Title VII of the Civil Rights Act of 1964.e

## SECOND CAUSE OF ACTION:
## RETALIATION
*Pursuant to 42 U.S.C. 2000e-3(a)*

108.    Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

109.    Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

110.    Plaintiff participated in both the internal discrimination investigation, EEOC investigation, and litigation arising from *Castro's* Title VII discrimination and retaliation claims. By participating, Plaintiff engaged in participation activity protected by the anti-retaliation provisions of Title VII.

111.    Almost immediately after the *Castro* Litigation reached out-of-court settlement, Plaintiff was forced to accept a significant demotion in lieu of resignation or immediate termination. As such, Plaintiff was subjected to adverse employment action by way of his forced demotion.

112.    The ten-day span between settlement and Plaintiff learning that he would be forced to accept a demotion readily evinces a causal connection between Plaintiff's protected activity and the decision to demote him.

113.    Then, after being subjected to an unwarranted and unjustified demotion, Plaintiff directed written correspondence to two (2) corporate representatives of Defendant, opposing what he reasonably believed to constitute unlawful retaliation for his previous participation in the *Castro* investigation and Litigation.

114.    Following the incidents alleged in the preceding paragraphs, Plaintiff also engaged the EEOC by filing a Formal Charge of Discrimination on or about June 9, 2018. The filing of a charge constitutes protected participation activity.

115.    Within mere months of Plaintiff's complaints to Defendant's corporate personnel and the filing of his EEOC Charge, Defendant terminated Plaintiff's employment on December 20, 2018.

116.    By virtue of his termination, Plaintiff suffered a materially adverse action.

117.    Plaintiff's protected activity was a but-for cause of Defendant demoting Plaintiff.

118.    For the reasons set forth in Paragraphs 88-104, Defendant's proffered justification(s) for demoting Plaintiff are pretextual.

119.    Plaintiff's protected activity was a but-for cause of Defendant terminating Plaintiff.

120.     For the reasons set forth in Paragraphs 88-105, Defendant's proffered justification(s) for demoting Plaintiff are pretextual. Additionally, at no time whatsoever did Beech instruct Plaintiff to refrain from speaking to Hebert directly regarding Hebert's allegations of deficient training. Moreover, neither Hebert, Beech, nor Odell could identify what "training" Hebert purportedly did not receive. Finally, Plaintiff had never, prior to his termination, been counseled or disciplined for "improper use of administrative authority."

121.     Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a).

122.     Defendant's retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

123.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

124.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered monetary losses including, but not limited to, back pay, front pay, medical and other benefits, and other losses to be more fully developed at the trial on this matter.

125.     Wherefore Plaintiff asks this Honorable Court to find Defendant, **MORAN TOWING OF LAKE CHARLES,** liable for the violation of 42 U.S.C. § 2000e-3(a).

---

## PRAYER

---

**WHEREFORE**, Plaintiff, **MIGUEL MARTINEZ**, requests that his Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Punitive or exemplary damages;

(c) Liquidated damages;

(d) Reasonable attorney's fees, with conditional awards in the event of appeal;

(e) Pre-judgment interest at the highest rate permitted by law;

(f) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(g) Costs, including expert fees;

(h) Reasonable and necessary medical care and expenses in the past and future;

(i) Mental anguish damages in the past and future;

(j) Injunctive relief; and

(k) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

*{Signature Page to Follow}*

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
1109 Pithon St.
Lake Charles, Louisiana 70601
Tel: (337) 480-0101
Fax: (337) 419-0507
Email: james@saa.legal

**BY:** _/s/ James E. Sudduth, III_
     **JAMES E. SUDDUTH, III, #35340**
     **KOURTNEY L. KECH, #37745**
     **PIERCE A. RAPIN, #38579**
     _Counsel for Plaintiff_